# In the United States Court of Federal Claims

|  |  |
|---|---|
| RICHARD NALTNER *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> THE UNITED STATES, <br><br> Defendant. | No. 21-cv-1064 <br><br> Filed: October 29, 2024 |

*Nicholas M. Wieczorek* of Clark Hill PLLC, Las Vegas, NV argued for Plaintiffs. With him on the briefs was *William D. Schuller* of Clark Hill PLLC, Las Vegas, NV.

*Albert S. Iarossi*, United States Department of Justice, Civil Division, Washington, DC argued for Defendant. With him on the briefs were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, Washington, DC; *Patricia M. McCarthy*, Director, Commercial Litigation, Washington, DC; *L. Misha Preheim*, Assistant Director, Commercial Litigation, Washington, DC; *Jane M. Brittan*, Of Counsel, United States Secret Service, Washington, DC.

## **MEMORANDUM AND ORDER**

The United States Secret Service (USSS, Secret Service, or Agency) and its special agents serve in a vital role, providing protection to high-ranking public officials, including the President and Vice President of the United States. Serving as a USSS special agent on a Presidential or Vice-Presidential detail requires long hours and a flexible schedule. Accordingly, Congress has enacted Federal pay statutes reflecting this unique role and special agents' atypical work schedule. Here, Plaintiffs Richard Naltner (Naltner) and David Deetz (Deetz) (collectively Plaintiffs), current and former USSS special agents, respectively, filed a putative class action suit against Defendant United States, acting by and through the USSS, contending that Defendant failed to pay them appropriate overtime wages in violation of 5 U.S.C. § 5542 and 5 U.S.C. § 5596. Amended Complaint (ECF No. 18) (Compl.) ¶¶ 42, 45. Specifically, Plaintiffs contend they were improperly

compensated for overtime hours due to either incorrect calculation or improper time recording as directed by their supervisors. *See id.* ¶¶ 12−13, 18, 22, 24, 26, 33; Opposition to Defendant's Motion for Summary Judgment (ECF No. 42) (Pl. Resp.) at 19–20.[1]

This is not the first adjudication over USSS overtime pay. In *Horvath v. United States*, the United States Court of Appeals for the Federal Circuit invalidated an Office of Personnel Management (OPM) regulation requiring minimum *consecutive*, unscheduled overtime hours, rather than *total* unscheduled hours to qualify for a certain type of overtime pay. 896 F.3d 1317, 1322 (Fed. Cir. 2018) (*Horvath I*). This action presents a narrow, follow-on issue related to that ruling. Specifically, whether Plaintiffs are due overtime back pay given the invalidation of the regulation. Defendant now moves for summary judgment, arguing that (i) neither Plaintiff is entitled to back pay for overtime work performed between March 15, 2015 and September 12, 2018, and (ii) all claims for additional pay that accrued prior to March 15, 2015 are barred by the statute of limitations. *See* Defendant's Motion for Summary Judgment (ECF No. 40) (Mot.) at 29–33; Mot., Ex. 1, Declaration of Steven Scott (ECF No. 40-1) (Scott Decl.) ¶ 10 (noting the date the Agency changed its policy in line with *Horvath I*).[2]

After considering the parties' arguments as presented in briefing and during Oral Argument, Defendant's Motion for Summary Judgment (ECF No. 40) is **GRANTED in part** and **DENIED in part**.

---

[1] Citations throughout this Memorandum and Order correspond to the ECF-assigned page numbers, which do not always correspond to the pagination within the document.

[2] On March 1, 2023, Plaintiffs also filed a Motion for Class Certification (ECF No. 41). On consent of the parties, this Court stayed briefing on the Class Certification Motion pending resolution of the present Motion. *See* Defendant's Motion to Stay Its Duty to File a Response to Plaintiffs' Motion for Class Certification (ECF No. 43) at 1; Order, dated Mar. 8, 2023 (ECF No. 46) at 4.

## BACKGROUND

The Secret Service is a bureau within the Department of Homeland Security charged with protecting top United States and foreign officials, among other duties.[3]  In these capacities, special agents record hours for performing both investigative and protective duties.[4]  At issue here is overtime pay for protective duties.  *See* Compl. ¶¶ 18–20, 22, 23 n.5, 30; *see also* 5 U.S.C. § 5542(e) (enabling overtime compensation for certain hours worked on protective details).

### I.    USSS Pay Structure

Given the nature of special agents' duties, the Secret Service typically schedules agents for 8-, 10-, and 12-hour shifts.  Scott Decl. ¶ 6; Mot. at 15.  Special agents are generally eligible to earn the following compensation for performing protective services on a given workday: (i) base pay; (ii) the Law Enforcement Availability Pay (LEAP) enhancement, 5 U.S.C. § 5545a; (iii) standard overtime under 5 U.S.C. § 5542(d) (Section 5542(d) overtime); and (iv) overtime for protective services under 5 U.S.C. § 5542(e) (Section 5542(e) overtime).  *See* Mot., Ex. 2, Declaration of David Toth (Branch Chief, Payroll Operations Branch) (ECF No. 40-2) (Toth Decl.) ¶ 4.

As explained in more detail below, for a 12-hour shift with no unscheduled overtime, agents are compensated for hours 1 through 8 with their base salary, for hours 9 and 10 with a fixed amount of "LEAP" premium pay, and for hours 11 and 12 with hourly pay at overtime rates under 5 U.S.C. § 5542(d).  Generally, all *unscheduled* overtime is compensated through LEAP. However, pursuant to 5 U.S.C. § 5542(e), working two hours of *unscheduled* overtime in a day on

---

[3] *See About Us*, U.S. Secret Service, https://www.secretservice.gov/about/overview (last visited Oct. 22, 2024).

[4] *See U.S. Secret Service*, Dep't of Homeland Security, https://www.dhs.gov/employee-resources/us-secret-service-usss (last visited Oct. 22, 2024).

protective services triggers hourly overtime pay instead of LEAP pay for that day's first two hours of *scheduled* overtime (*i.e.*, hours 9 and 10).  *See Horvath v. United States* (*Horvath II*), No 16–668C, 2020 WL 1487642, at *1 (Fed. Cl. Mar. 25, 2020) (citing *Horvath I*, 896 F.3d at 1318−19); *infra* Background Section I.A–C.

Special agent compensation is subject to bi-weekly[5] and annual pay caps, which limit the amount of compensation a special agent may earn within those periods.  *See, e.g.*, 5 U.S.C. §§ 5307, 5547; *see also* Toth Decl. ¶ 5.  Here, Plaintiffs allege Defendant improperly compensated them pursuant to LEAP for certain protective service hours when instead Plaintiffs should have been compensated at the higher Section 5542(e) overtime rate.  *See* Compl. ¶¶ 19, 20, 22–27.[6]

### A.    Base Pay

The term "base pay" refers to the special agent's standard salary, which is calculated based on an hourly base pay rate the agent earns for working a 40-hour workweek.  *See* 5 U.S.C. § 5545a(b).  The first eight scheduled hours that a special agent works in each workday are always compensated at the agent's hourly base pay rate.  *See Horvath I*, 896 F.3d at 1320.  The hourly base pay rate is set based on the agent's position on the GS Schedule.  Toth Decl. ¶ 3.

### B.    Law Enforcement Availability Pay (LEAP)

Special agents can also earn a type of premium pay, known as a LEAP enhancement.[7]  The LEAP enhancement is "availability pay" designed to "ensure the availability of criminal

---

[5] Special agents are paid bi-weekly, across approximately 26–27 pay periods per calendar year. Toth Decl. ¶ 3.

[6] Plaintiffs cite the Federal Circuit's decision in *Horvath v. United States*, 896 F.3d 1317 (Fed. Cir. 2018) (*Horvath I*), regarding the implementation of Section 5542(e) overtime.  *See infra* Background Section III.

[7] Though the LEAP enhancement is often framed as "premium pay," LEAP is part of a special agent's basic pay each pay period.  *See* Mot. at 12 ("[S]pecial agents, as criminal investigators, are paid premium pay as part of their basic pay in the form of LEAP under 5 U.S.C. § 5545a."); Compl.

investigators for unscheduled duty in excess of a 40-hour work week based on the needs of the employing agency."  5 U.S.C. § 5545a(b); *see Horvath I*, 896 F.3d at 1318; *see also* Compl. ¶¶ 8–10; Mot. at 7–9.  Put another way, LEAP compensates special agents for the unscheduled overtime (*i.e.*, being asked to start a shift early or stay late) that is part and parcel of serving as a special agent.  LEAP is a fixed 25% enhancement added on top of a special agent's base salary each pay period, which is paid as long as the agent averages two extra hours of work each day over the course of the year.  *See* 5 U.S.C. § 5545a(d)(1), (2);[8] *see also* 5 U.S.C. § 5545a(h)(1); Compl. ¶ 17.  Accordingly, under LEAP, special agents are not compensated directly for each hour of unscheduled overtime worked.  Instead, agents are compensated for those hours through LEAP's 25% increase to their base pay.

In addition to compensating agents for all *unscheduled* overtime, as discussed above, LEAP also compensates agents for the first two hours of *scheduled* overtime on a regular workday (*i.e.,* hours 9 and 10) if the agent performs no unscheduled hours that day.  *See* 5 U.S.C. § 5542(d)(2), (e); *see also* Mot. at 8 ("The first two hours of scheduled overtime on regular work days . . . and all hours of unscheduled overtime . . . are considered to be LEAP time.").  Agents are otherwise compensated for scheduled overtime under Section 5542.

---

¶ 17 ("LEAP . . . is therefore part of 'basic pay' . . . and is not overtime compensation.") (citations omitted).

[8] A special agent will receive the 25% enhancement each pay period so long as the agent annually certifies that he has averaged, and will continue to average, at least two extra hours of work each day.  *See* 5 U.S.C. 5545a(d) (requiring that total of (1) "the annual average of unscheduled duty hours worked by the investigator in excess of each regular work day;" and (2) "the annual average of unscheduled duty hours such investigator is available to work on each regular work day" are "equal to or greater than 2 hours" per day); *id.* § 5545a(e)(1) (requiring an annual certification of eligibility for LEAP); *see also* Mot. at 7.

### C.    Overtime Pay Pursuant to 5 U.S.C. §§ 5542(d) and (e)

For certain *scheduled* overtime hours, special agents can earn standard overtime compensation, paid by the hour at 1.5 times the agent's hourly base pay rate.  *See* 5 U.S.C. § 5542(a)(1), (2); *Horvath I*, 896 F.3d at 1319; *see also* Mot. at 11 n.4.  There are two types of standard overtime compensation pertinent here: Section 5542(d) overtime and Section 5542(e) overtime.  Whether an agent is paid under Section 5542(d) or Section 5542(e) depends on the number of scheduled and unscheduled hours the agent worked that day, and whether the agent was performing protective services during those hours.

### 1.    Section 5542(d) Overtime

Section 5542(d) provides for "standard overtime."[9]  Under Section 5542(d), a criminal investigator can receive overtime pay for scheduled overtime hours that are "(A) in excess of 10 hours on a day during such investigator's basic 40 hour workweek; or (B) on a day outside such investigator's 40 hour workweek."  5 U.S.C. § 5542(d)(1).

Thus, for a regular workday on which an agent is scheduled to work 12 hours, with no unscheduled overtime, the agent will earn the following compensation.  First, the agent will earn base pay for hours 1 through 8.  Then, the agent will earn LEAP for hours 9 and 10 because agents are compensated under LEAP for the first two hours of *scheduled* overtime when the agent performs no unscheduled hours.  *See* 5 U.S.C. § 5542(d)(2), (e); Mot. at 8.  Lastly, the agent will earn standard overtime under Section 5542(d) for hours 11 and 12.  *See* Mot. at 10; Pl. Resp. at 10.  This scheme describes what is known as the Agency's "8-2-2 policy."  *See Horvath I*, 896 F.3d at 1320; Pl. Resp. at 10.

---

[9] "Standard overtime" is available to "any criminal investigator who is paid availability pay under section 5545a [LEAP enhancement]."  5 U.S.C. § 5542(d); *see* Mot at 9.

### 2. Section 5542(e) Overtime

However, Section 5542(e) creates an exception that allows for the first two hours of scheduled overtime (*i.e.*, hours 9 and 10) to be compensated at the standard overtime rate (rather than LEAP) in a specific situation. Under Section 5542(e), an agent earns the standard overtime rate for the first two scheduled overtime hours, which would otherwise be compensated under LEAP if (1) those hours are spent on protective services and (2) the agent works at least two hours of unscheduled overtime on the same day. *See* 5 U.S.C. § 5542(e). Thus, to receive Section 5542(e) overtime for the first two scheduled overtime hours instead of LEAP, an agent must also work at least two additional hours of unscheduled overtime. 5 U.S.C. § 5542(e).[10]

To illustrate, on a regular workday on which an agent is scheduled to work 12 hours but works an additional two hours of unscheduled work (*i.e.*, a 14-hour day), the agent will earn the following compensation. First, the agent will earn base pay for hours 1 through 8. Second, the agent will earn Section 5542(e) overtime, instead of LEAP, for hours 9 and 10 because they are scheduled overtime hours for protective duty *and* the agent also worked two hours of unscheduled overtime. Third, the agent will earn the standard overtime rate under Section 5542(d) for hours 11 and 12 (the remaining hours of the scheduled overtime). Lastly, the agent's additional two unscheduled hours—hours 13 and 14—are compensated by LEAP.

As another example, if an agent is scheduled for 10 hours and works at least two hours of unscheduled overtime, the agent can still receive Section 5542 overtime, but only two hours and pursuant to Section 5542(e), rather than 5542(d). First, the agent will receive base pay for hours 1 through 8. Next, the agent will receive Section 5542(e) overtime for hours 9 and 10 because those are scheduled overtime hours involving protective duties and the agent has also worked at

---

[10] By contrast, eligibility for Section 5542(d) overtime requires *over* 10 scheduled work hours. *See supra* Background Section C.1.

least two unscheduled overtime hours.  As the agent has no scheduled overtime in excess of 10 hours, the agent is not entitled to any Section 5542(d) overtime.  Finally, any unscheduled hours (*i.e.*, hours 11 and 12) are compensated by LEAP.

### D.    Pay Caps

Special agents are subject to federal pay caps that limit the total compensation they may receive per pay period and calendar year.  5 U.S.C. §§ 5307, 5547.  There are two types of pay caps applicable to special agents as executive branch employees compensated on the GS-pay scale: bi-weekly and annual caps.  *See* 5 U.S.C. § 5547(a), (b).  Employees can receive premium pay only to the extent that the aggregate of their basic and premium pay for any pay period (Section 5547(a)),[11] or calendar year (Section 5547(b)),[12] does not exceed the greater of (1) the maximum

---

[11] This section limits the total amount of overtime that can be received during a pay period:

> An employee may be paid premium pay under section 5542 . . . and . . . 5545a . . . only to the extent that the payment does not cause the aggregate of basic pay and such premium pay *for any pay period* for such employee to exceed the greater of . . . (1) the maximum rate of basic pay payable for GS-15 (including any applicable locality-based comparability payment . . .); or (2) the rate payable for level V of the Executive Schedule.

5 U.S.C. § 5547(a) (emphasis added).

[12] This provision states that "the head of an agency may determine that [Section 5547(a)] shall not apply to an employee who is paid premium pay to perform work that is critical to the mission of the agency," meaning such an employee would not be subject to the pay period compensation limitation outlined in Section 5547(a).  5 U.S.C. § 5547(b)(3).  However, if such a determination is made by the agency head, those

> employees may be paid premium pay under the provisions of law cited in subsection (a) if, or to the extent that, the aggregate of the basic pay and premium pay under those provisions for such employee would not, *in any calendar year*, exceed the greater of . . . (A) the maximum rate of basic pay payable for GS-15 in effect at the end of such calendar year (including any applicable locality-based comparability payment . . .); or (B) the rate payable for level V of the Executive Schedule in effect at the end of such calendar year.

rate of basic pay for an employee at the GS-15 level (including locality pay), or (2) the rate payable for level V of the Executive Schedule. *See* 5 U.S.C. § 5547; Toth Decl. ¶ 3; *see also* Mot. at 11 ("[I]f a special agent has hit one of these pay caps, then the agent may not receive additional overtime pay even if, in the absence of such a pay cap, the hours worked would be compensated at an overtime rate.").

If an agent has reached the bi-weekly or annual pay caps for a given period, he can still be ordered to perform overtime work, but he will not receive compensation for those hours immediately. *See generally* 5 U.S.C. § 5547; *see* Toth Decl., Attach. A, Excerpt of OPM Bi-Weekly and Annual Federal Pay Caps 2015–2018 (ECF No. 40-2) at 010 (citing Comptroller General Opinions: B-178117, May 1, 1973; B-229089, December 29, 1988; and B-240200, December 20, 1990). However, contingent upon the Secret Service's budget and the type of services the agent provided (*i.e.*, protective or non-protective), the agent may receive a "max-out" or "super-max" payment at the end of the year.

If a special agent exceeds the bi-weekly pay cap for a given pay period, his Earnings & Leave (E&L) Statement for that pay period will include an "over earn" notation that "shows how much premium pay an employee could be paid if they were not subject to the bi-weekly or annual pay caps." Toth Decl. ¶ 15; *see* 5 U.S.C. § 5547(a); 5 C.F.R. § 550.105(a); *see also* Mot. at 12. If the agent exceeds a bi-weekly pay cap for any period, but not the annual pay cap, the agent will receive at the end of the year a lump sum payment for an amount up to the annual federal pay cap to compensate the agent for the unpaid premium pay that was withheld each pay period. 5 C.F.R. § 550.106(e); *see* Toth Decl. ¶¶ 5, 7; Mot. at 12. Defendant states this "max-out" payment is

---

5 U.S.C. § 5547(b)(3) (emphasis added).

contingent on the extent to which Secret Service has funds remaining in its budget.  Toth Decl. ¶ 5; Mot. at 12.

In 2016, Congress passed the Overtime Pay for Protective Services Act (OPPSA).  OPPSA raised the annual federal pay cap for hours involving protective services and granted special agents working in protective services additional premium pay over the annual federal pay cap outlined in Section 5547.  *See* OPPSA, Pub. L. No. 114-311, §§ 1, 2, 130 Stat. 1531, 1531–32 (2016);[13] *see also* Mot. at 12–13.  This raised the maximum pay for an agent performing overtime protective services.[14]  Thus, if an agent earned premium pay for protective services that exceeded both the bi-weekly and annual pay caps, he would be eligible for a secondary lump sum payment, known as the "super-max" payment.  *See* § 2, 130 Stat. at 1531; *see also* Toth Decl. ¶ 7; Mot. at 13.  However, the OPPSA super-max payment only covers the excess uncompensated pay associated with protective services.  To be eligible for the super-max payment, agents must have coded overtime in their Web Time and Attendance (WebTA) timecards as "protective services."  *See* Toth Decl. ¶ 7; Mot. at 13; *see also* § 2, 130 Stat. at 1531.  Non-protection premium pay hours are not covered by OPPSA.  They are subject only to the bi-weekly and annual pay caps under 5 U.S.C. § 5547.  *See* § 2, 130 Stat. at 1531; *see also* Toth Decl. ¶ 7; Mot. at 13.

## II.    The Scheduling Process and Time-Keeping Systems at USSS

At the beginning of each administrative workweek, special agents who work protective duties receive weekly schedules that list the agent's assignments for the upcoming week.  *See* Mot., Ex. 5, Deposition Transcript of Steven Scott (ECF No. 40-5) (Scott Depo.) at 20:9–13; *see also*

---

[13] This Act was subsequently amended to extend its application through 2028.  *See* Overtime Pay for Protective Services Act of 2023, Pub. L. No. 118–38, § 1, 2, 138 Stat. 13, 13 (2024).

[14] Under OPPSA, an agent can earn to the greater of (1) the maximum rate of basic pay payable at the GS-15 level, or (2) the rate payable for Level II of the Executive Schedule (which is a higher level than Level V).  § 2, 130 Stat. at 1531; *see* Toth Decl. ¶ 6; Mot. at 13.

Mot. at 15. Agents are typically scheduled for 8-, 10-, and 12-hour shifts, with all hours beyond the 8-hour mark deemed "scheduled in advance." Scott Decl. ¶ 6; Mot. at 15. If operational needs require modifications to the agent's schedule after the workweek has begun, the issuing division can make changes, known as "red-pen" schedules. *See* Scott Depo. at 22:9–16; 68:15–69:11; *see also* Mot. at 15–16. Any additional overtime hours added to the red-pen schedules are considered "unscheduled overtime." *See* Mot. at 16; 5 U.S.C. § 5542(d)(1) (requiring "overtime work which is scheduled in advance"). Defendant acknowledges that not all unscheduled overtime hours are reflected in red-pen schedules. *See* Mot. at 16 n.6 ("Unscheduled overtime may also be worked when a special agent is unexpectedly required to spend additional time on protective duty because of operational requirements. Those hours may not necessarily be reflected in red-pen schedules.").

The USSS uses two software systems for timekeeping, the Monthly Activity Reporting System (MARS) and WebTA. *See* Scott Decl. ¶¶ 4–5, 7–9; *see generally* Mot. at 15–21. Each of the systems serves a distinct purpose and neither of the systems are synchronized with the other, meaning they run independently and have no integrative capabilities. Scott Decl. ¶ 8; *see* Mot. at 18.

### A.    Monthly Activity Reporting System (MARS)

The USSS uses MARS to track the number of regular, LEAP, and scheduled overtime hours a special agent has worked each month. Scott Decl. ¶ 5; *see* Mot. at 16–17. Though the system tracks LEAP hours, it does not differentiate between scheduled and unscheduled overtime hours. Scott Decl. ¶ 5; *see* Mot. at 17. Within MARS, the special agent must record the specific time at which the agent worked any hours and the type of activity performed during those hours (*i.e.*, protective versus investigative assignments). Scott Decl. ¶ 5; *see* Mot. at 16–17. Because MARS requires agents to report the precise time of day at which the agents worked their hours,

the system can identify all days on which an agent's LEAP hours were non-consecutive, including if they were "split" between the beginning and end of an agent's scheduled shift—*i.e.*, "split-LEAP." Scott Decl. ¶ 5; *see* Mot. at 16–17. At the end of the month, an agent must certify that the hours reported in MARS accurately reflect the time and nature of the hours the agent worked for each day that month. Scott Decl. ¶ 5; Mot. at 16.[15]

### B. Web Time and Attendance System (WebTA)

The USSS uses WebTA to track an employee's hours for payment purposes. *See* Scott Decl. ¶ 7; Mot. at 17. Special agents must "validate and affirm" that their time is entered correctly. Scott Decl. ¶ 7; *see* Mot at 17 ("[S]pecial agents input, validate, and affirm the number and nature of the hours that they actually worked. That is, they record the number of regular base pay hours worked, the number of overtime hours worked, the number of LEAP hours worked, and the number of leave hours taken."). Agents then receive payment based on what is recorded within the WebTA system. *See* Scott Decl. ¶ 7; Mot. at 17. WebTA, like MARS, does not distinguish whether LEAP hours were scheduled or unscheduled. *See* Scott Decl. ¶ 7; Mot. at 18. Unlike MARS, however, WebTA does not track the specific time of day during which the agent works each hour. *See* Scott Decl. ¶ 7; Mot. at 17; *see also* Mot., Ex. 4 Deposition Transcript of Richard Naltner at 47:19–48:3.

### III. *Horvath* Decisions

The present action is a follow-on case to that of another USSS special agent who had filed a separate action in 2016 for alleged improper compensation under the same statutes and regulations at issue here. *See Horvath I*, 896 F.3d at 1318–20. Specifically, the Plaintiffs in *Horvath* challenged an OPM regulation that required special agents to work at least two hours of

---

[15] Plaintiffs do not challenge Defendant's description of the system. They do, however, assert the system is obsolete. Resp. at 25. They also challenge the accuracy of recorded hours and validity of Defendant's review because of alleged supervisory guidance provided to agents, which was based on the now-invalidated regulation—5 C.F.R. § 550.182(b)(2). *See id.* at 25–28.

*consecutive*, unscheduled overtime for Section 5542(e) to apply. *Id.* at 1318 (citing 5 C.F.R. § 550.182(b)(2)). The now-invalidated regulation provided that a "split-LEAP," where an agent had worked an unscheduled shift of less than two hours on each end of an Agent's scheduled shift (*i.e.*, one hour in the morning and one in the afternoon, as opposed to two consecutively worked hours in the afternoon), was not compensable as Section 5542(e) overtime. *See Horvath II*, 2020 WL 1487642, at *2; *see also* Mot. at 16–17; Scott Decl. ¶ 5. The Federal Circuit invalidated the regulation as contrary to the statute, and the USSS updated its pay policies accordingly in compliance with the Circuit's decision. *See Horvath I*, 896 F.3d at 1321–22; Scott Decl. ¶ 10.

On remand, the assigned judge denied the government's motion for summary judgment.[16] *Horvath II*, 2020 WL 1487642, at *3–4. The court noted that although the government had demonstrated that the OPM regulations may be "less consequential" to Horvath's claims for backpay than Horvath had believed, "the [government] fail[ed] to demonstrate that Mr. Horvath will necessarily lack the evidence to prove entitlement to additional § 5542(e) pay at trial." *Id.* at *3. Specifically, the court concluded that Horvath's identification of days where he met the conditions for compensation under Section 5542(e) but was instructed to report two fewer overtime hours constituted a material issue of fact sufficient to withstand summary judgment. *Id.* at *4. The court also held that "Mr. Horvath's claim can fairly be read to encompass[] any of the [defendant's] pay policies that misapply § 5542(e)." *Id.*

## IV.    Present Action

Naltner is a current USSS special agent who has been employed by the Agency since October 2007. Compl. ¶¶ 3, 8; Pl. Resp., Ex. A, Declaration of Richard Naltner (ECF No. 42-1)

---

[16] After denying the Government's motion for summary judgment, the court ultimately denied plaintiff's motion for class certification. See *Horvath v. United States*, 149 Fed. Cl. 735, 751 (2020).

(Naltner Decl.) ¶ 2.  Deetz is a former special agent employed by USSS from January 4, 1998 until

September 29, 2018.  Compl. ¶¶ 4, 9; Pl. Resp., Ex. B, Declaration of David Deetz (ECF No. 42-

2) (Deetz Decl.) ¶ 2.  It is undisputed that both Plaintiffs qualify as criminal investigators[17] for the

purposes of the Federal Employee Pay Act.  *See* Compl. ¶ 11; Mot. at 6–7; *see also* Scott Decl. ¶¶

10–12 (performing a review of Plaintiffs' overtime eligibility with that understanding).  The parties

also agree that Plaintiffs performed protective services, as described in 18 U.S.C. § 3056,

throughout their tenure as special agents.  *See* Compl. ¶ 18; Mot. at 5.

Plaintiffs claim that the USSS failed to pay them standard overtime pay, instead of LEAP

pay, for select protective detail hours worked between 2014 and 2018.  *See* Compl. ¶¶ 1, 7, 19–21.

Specifically, Naltner contends that he is due additional pay for hours worked between 2014 and

2018 and Deetz makes the same claim for hours worked between 2016 and 2018.[18]  *Id.* at ¶¶ 19–

20.  Plaintiffs clarify that their claims are not limited to improper compensation caused by the now-

invalidated regulation—*i.e.*, in split-LEAP instances (dates on which Plaintiffs had worked at least

two unscheduled protective duty hours, but not consecutively).  *See id.* ¶¶ 7, 33(a)–(b), 42.

Defendant moves for summary judgment, asserting that its review of split-LEAP instances

demonstrates that Plaintiffs are not entitled to further pay and that Plaintiffs' claims that accrued

---

[17] "Criminal investigator" is defined, in the statute governing availability pay for criminal investigators, as "a law enforcement officer as defined under section 5541(3)," who meets a series of additional attributes such as "possessing[ing] a knowledge of investigative techniques, laws of evidence, rules of criminal procedure, and precedent court decisions concerning admissibility of evidence, constitutional rights, search and seizure, and related issues" and "demonstrat[ing] skills in applying surveillance techniques, undercover work, and advising and assisting the United States Attorney in and out of court."  5 U.S.C. § 5545a(a)(2)(A), (C) ; *see also* 5 C.F.R. § 550.103.

[18] Both Naltner and Deetz state in the Complaint that the hours for which they seek compensation may change based on further investigation and analysis.  Compl. ¶¶ 19–20.  While it initially appeared that Deetz sought compensation for at least some dates in 2015, at Oral Argument his counsel subsequently acknowledged that Deetz had hit the pay cap for 2015.  *See* Deetz Decl. ¶¶ 3, 11, 18–21; Oral Arg. Tr. at 78:24–79:1; Scott Decl. ¶¶ 24–25; *infra* Discussion Section II.B.

prior to March 15, 2015 are barred by the statute of limitations. Mot. at 5, 29, 32–33. Defendant bases this contention on its own review of Plaintiffs' schedule and pay records. *See id.* at 19–28. In conducting its review, Defendant only searched in Plaintiffs' MARS records for instances of split-LEAP protective duty, separated by 10 or more hours. Scott Decl. ¶¶ 10, 11(a). The weekly schedule for any such instance was reviewed to determine if the hours were scheduled or unscheduled. *Id.* ¶ 11(b). If unscheduled, Defendant reviewed WebTA to verify whether Plaintiffs were properly compensated. *Id.* ¶ 11(c). Finally, Defendant analyzed whether Plaintiffs had reached applicable pay caps. *Id.* ¶ 11(d).

According to Defendant, its review determined that Naltner never recorded split-LEAP hours. *Id.* ¶ 13. Defendant also determined Deetz had five split-LEAP instances between September 2015 and November 2016, *id.* ¶ 14, but that Deetz was actually properly compensated for all such instances, *id.* ¶¶ 15–23. Defendant also asserts Deetz was ineligible for additional pay for 2015 and 2016 because he had hit applicable pay caps, *id.* ¶¶ 24–25, a contention with which Plaintiffs agreed at oral argument, s*ee* Oral Argument Transcript, dated May 17, 2023 (ECF No. 49) (Oral Arg. Tr.) at 78:24–79:1.

Plaintiffs challenge the accuracy of Defendant's review and further assert they lack access to materials in Defendant's possession necessary to fully demonstrate improper compensation:

> [A proper analysis] would need to look at original schedules issued prior to the workweek showing scheduled overtime, "red-penned" schedules which show changes in scheduling after the original schedules were issued, emails to and from [Plaintiffs'] supervisors regarding overtime hours as well as related internal emails regarding [Plaintiffs'] own emails.

Pl. Resp. at 17–18 (alterations in original); Naltner Decl. ¶ 5; Deetz Decl. ¶ 5. Plaintiffs provided two documents they claim demonstrate a genuine issue of material fact: (1) a list of Naltner's overtime hours with notations regarding missing schedules for comparison, *see* Pl. Resp., Ex. G (ECF No. 42-7) (Naltner Timesheet); and (2) a compilation of emails from supervisors that purport

to reinforce the need for consecutive unscheduled hours to be eligible for Section 5542 overtime, *see id.*, Ex. H (ECF No. 42-8) (Emails).  Plaintiffs further request an adverse inference as to allegedly missing red-pen schedules, which they contend Defendant failed to produce, and which they further contend would reflect Plaintiffs' unscheduled overtime hours.  Pl. Resp. at 31−33.

On January 31, 2024, this Court found that original and red-pen schedules are relevant to Plaintiffs' ability to prove their claims, and that Defendant's explanation for the missing schedules was insufficient for the Court to adjudicate Plaintiffs' spoliation claim.  Order Directing Supplemental Briefing on Defendant's Motion for Summary Judgment (ECF No. 50) (Supplemental Briefing Order or Suppl. Br. Order) at 9–10.  The Court therefore ordered Defendant to provide:

> [A] detailed explanation, accompanied by a supportive declaration, describing (1) its search for original schedules, red-pen schedules, and relevant supervisory emails for each Plaintiff, and (2) the Agency's document retention policy, an explanation of whether relevant documents were subject to a litigation hold pursuant to *Horvath*, and how Defendant identified such documents to be destroyed, attaching a copy of any such policy to the declaration.

*Id.* at 11–12.  The Court further directed that, if Defendant determined a further search was necessary, it should provide a detailed explanation of that search (by declaration) and submit any relevant discovered documents not initially disclosed to Plaintiffs.  *Id.* at 12.

On March 29, 2024, Defendant filed its Supplemental Brief, which describes both its 2022 records search and a 2024 records search undertaken in response to the Supplemental Order. *See* Defendant's Supplemental Brief in Support of Summary Judgment (ECF No. 51) (Supplemental Brief or Def. Suppl. Br.) at 5–9.  It further explains how the Agency's 2024 search resulted in the discovery and production of schedules and emails not originally produced.  *See id.*  Defendant also acknowledged its prior record-keeping vulnerabilities, described the three-year USSS General Records Schedule regarding document retention, and acknowledged that an active litigation hold

on relevant records was in place.  *See id.* at 3–5.  In producing its document retention policy, Defendant noted that the USSS generally maintains time and attendance records for three years. *Id.* at 4 (citing *id.*, Ex. 8, Declaration of Jane Brittan (ECF No. 51) (Brittan Decl.), Attach. A, General Records Schedule 2.4).

Contrary to its prior assertion to this Court, however, Defendant now acknowledges that the USSS Office of Chief Counsel (OCC) instituted a litigation hold in July 2016 to investigative field offices and protective divisions regarding scheduling documents after initiation of *Horvath* (June 10, 2016), and that the hold has remained continuously in place since that time.  *Compare id.* at 4–5 (citing Brittan Decl. ¶¶ 6, 10) ("[O]n June 10, 2016, the OCC issued a litigation hold . . . .")), *with* Defendant's Reply in Support of its Motion for Summary Judgment (ECF No. 47) (Def. Reply) at 24 ("That means that no litigation hold was in effect until [March 2021] at the earliest . . . ."); Oral Arg. Tr. at 52:24–53:2, 53:5–7 ("The Court: "[W]as there a duty for the agency to keep these schedules?  Do you know if there was some sort of duty to keep these or if it was division by division or there was no duty?"  Defendant Counsel: "I think that the records were maintained in the ordinary course and destroyed in the ordinary course.").  Defendant goes on to state, however, that it is not aware of any schedules "created or destroyed in the course of this litigation," and that the OCC never directed or gave permission to dispose of any schedules.  Def. Suppl. Br. at 10 (citing Brittan Decl. ¶¶ 26–27).

Defendant's 2024 search, conducted in response to this Court's Supplemental Briefing Order, netted the following: (i) two emails that "reflect[ed] the hours that Mr. Deetz and other post-standers had worked for September 19, 2015, and November 11, 2016," *id.* at 8 (citing Brittan Decl., Attach. C, Government Supplemental Production, at GOV001812–1825); and (ii) red-pen schedules for the remaining nine dates claimed by Naltner, *id.* at 9 (citing Brittan Decl. ¶¶ 24–25

17

(citing *id.*, Attach. C, at GOV 001792–1811)).

Despite its production of newly discovered documents, Defendant asserts that its previous, split-LEAP analysis remains unchanged, and that the evidence does not support an adverse inference. *See id.* at 9–12. Accordingly, Defendant reiterates its request that the Court deny Plaintiffs' request for an adverse inference and grant Defendant's Motion for Summary Judgment. *Id.* at 12.

On April 12, 2024, Plaintiffs filed their Response to Defendant's Supplemental Brief, requesting that the Court deny Defendant's Motion for Summary Judgment, find that the Agency engaged in conduct intended to conceal and destroy evidence, and lift the stay on Plaintiffs' Motion for Class Certification. *See* Response to Defendant's Supplemental Brief in Support of Summary Judgment (ECF No. 52) (Pl. Suppl. Resp.) at 4, 11. Plaintiffs make five arguments in support of their spoliation claim. *First*, Plaintiffs assert that Defendant inappropriately used a different designee witness during discovery despite Ms. Brittan's availability. *Id.* at 6–7 (citing Scott Depo. at 2:17–21). *Second*, Plaintiffs assert that Defendant withheld documents during discovery in the present case, noting the additional documents produced following the Court's Supplemental Briefing Order. *Id.* at 7. *Third*, Plaintiffs assert a proper search would have revealed all of Plaintiffs' work schedules, specifically because the USSS protective division purportedly had a duty to email reports of their agents' scheduled overtime to the Assistant Director's office. *See id.* at 8–9 (citing *id.*, Ex. F, Supplemental Declaration of David Deetz (Deetz Suppl. Decl.) (ECF No. 52-6) at ¶¶ 3–5). *Fourth*, Plaintiffs assert that the Court should disregard Defendant's legal argument regarding Plaintiffs' failure to demonstrate instances of improper compensation or the requirements for an adverse inference because "[t]he Court did <u>not</u> invite the Agency to include legal arguments in its supplement," and Defendant "defie[d] the order by arguing against a

potential adverse inference." *See id.* at 9–10 (emphasis in original). *Finally*, Plaintiffs claim that their review of the additional documents produced by Defendant revealed instances of unpaid overtime worked during the relevant timeframe. *Id.* at 10.

On April 23, 2024, Defendant filed its Reply, asserting that it had already proved that Plaintiffs "are not entitled to overtime pursuant to 5 U.S.C. § 5542(e) for working split-LEAP hours." Defendant's Reply to Plaintiffs' Supplemental Response Brief (ECF No. 54) (Supplemental Reply or Def. Suppl. Reply) at 1.[19] Defendant points to three examples, based on the newly provided records, that it claims demonstrate that Naltner's assertions regarding unpaid overtime are all "simply wrong." *Id.* at 2.[20] Defendant claims it could make similar showings for each date Naltner lists in Plaintiffs' Supplemental Response, and it reasserts the conclusion that Naltner was "paid for all overtime he was entitled to under § 5542." *Id.* at 4.

## APPLICABLE LEGAL STANDARDS

Pursuant to Rule 56(a) of the Rules of the United States Court of Federal Claims, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a).[21] The moving party seeking summary judgment "has the initial burden of establishing that there is no genuine dispute as to any material fact." *8x8, Inc. v. United States*, 854 F.3d 1376, 1380 (Fed. Cir. 2017)

---

[19] This document was initially attached to Defendant's Motion for Leave to File Reply (ECF No. 53) and was filed by leave of this Court on April 23, 2024. *See* Minute Order, dated Apr. 23, 2024.

[20] Defendant claims that on March 22, 2016, May 6, 2016, and August 7, 2016, Naltner was not entitled to any additional overtime under Section 5542(e) because he allegedly did not work any unscheduled hours of overtime. *See* Def. Suppl. Reply at 2–4.

[21] "The Court of Federal Claims applies the same summary judgment standard as that of federal district courts . . . ." *Long Island Sav. Bank, FSB v. United States*, 503 F.3d 1234, 1243 (Fed. Cir. 2007); *see* Fed. R. Civ. P. 56(a).

(citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  In applying Rule 56, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in the non-movant's favor." *Almanza v. United States*, 935 F.3d 1332, 1336–37 (Fed. Cir. 2019) (citing *Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1302 (Fed. Cir. 2005)).

Once the movant has satisfied its initial burden, "the opposing party must establish a genuine issue of material fact and cannot rest on mere allegations, but must present actual evidence." *Long Island Sav. Bank, FSB*, 503 F.3d at 1244 (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986)); *see also K–Con Bldg. Sys., Inc. v. United States*, 778 F.3d 1000, 1004 (Fed. Cir. 2015); *Crown Operations Int'l, Ltd. v. Solutia Inc.*, 289 F.3d 1367, 1375 (Fed. Cir. 2002); *Brown v. United States*, 29 F. App'x 588, 591 (Fed. Cir. 2002).  The non-moving party can establish a genuine dispute of material fact only if it offers sufficient evidence "such that a reasonable [factfinder] could return a verdict for the nonmoving party." *Aspects Furniture Int'l, Inc. v. United States*, 42 F.4th 1366, 1369 (Fed. Cir. 2022) (citing *Anderson*, 477 U.S. at 248–49); *see also TNS Media Rsch., LLC v. TIVO Rsch. & Analytics, Inc.*, 629 F. App'x 916, 940 (Fed. Cir. 2015) (citing *Anderson*, 477 U.S. at 249–50) ("In response to a well-supported summary judgment motion, however, to create a triable issue of fact the nonmoving party must proffer evidence sufficient for a jury to find for that party.").  If the non-moving party's evidence is "merely colorable," or is "not significantly probative," then the court may grant summary judgment. *Anderson*, 477 U.S. at 249–50.

Where the burden has shifted to the non-movant to provide actual evidence, that party must "set forth specific facts showing that there is a genuine issue for trial." *Shum v. Intel Corp.*, 633 F.3d 1067, 1076 (Fed. Cir. 2010) (citing *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987)); *Anaheim Gardens v. United States*, 109 Fed. Cl. 33, 37 (2013)

(citing *Cable Elec. Prods., Inc. v. Genmark, Inc.*, 770 F.2d 1015, 1022 (Fed. Cir. 1985), *overruled on other grounds by Mw. Indus., Inc. v. Karavan Trailers, Inc.*, 175 F.3d 1356, 1358–59 (Fed. Cir. 1999) (en banc)).

## DISCUSSION

Plaintiffs' opposition to summary judgment initially relied on its request for an adverse inference attributable to Defendant's alleged spoliation of evidence and failure to provide requested relevant records during discovery. *See generally* Pl. Resp. Having received additional records and information upon supplemental briefing, Plaintiffs maintain their request for an adverse inference and assert that demonstrated instances of improper compensation exist sufficient to create a genuine issue of material fact. *See* Pl. Suppl. Resp. at 3–4, 10.

*First*, this Court addresses whether an adverse inference is warranted. For the reasons stated below, the Court holds that Plaintiffs are not entitled to an adverse inference because the record does not support a finding that Defendant acted with a culpable state of mind, despite that Defendant did not initially produce all records during discovery and misinformed this Court about the existence of a litigation hold. Accordingly, under Federal Circuit jurisprudence, Plaintiff has not met the requirements for the imposition of an adverse inference against Defendant.

*Next*, this Court turns to the merits of the dispute and addresses whether a genuine issue of material fact exists. The parties agree that Deetz is not entitled to additional pay in 2015 and 2016. *See* Oral Arg. Tr. at 78:24–79:1; Scott Decl. ¶¶ 24–25. Accordingly, Defendant's Motion is granted with regard to Deetz's claims for additional pay in 2015 and 2016. However, for the remaining claims (*i.e.*, Deetz's additional claims and Naltner's claims), Plaintiffs have demonstrated that a genuine issue of material fact exists concerning whether they are due additional compensation. Plaintiffs have met their burden through reference to schedule and pay

records, as well as to emails allegedly including instructions limiting the amount of overtime special agents could claim.  Accordingly, Defendant is not entitled to summary judgment on these claims.

*Lastly*, this Court turns to the statute of limitations argument asserted by Defendant. Because Plaintiffs are barred from bringing claims that had not accrued before the March 15, 2015 statute of limitations deadline and the statute of limitations period is not tolled, Defendant's Motion is granted with respect to any remaining claims that had accrued prior to March 15, 2015.

## I.    Plaintiffs Are Not Entitled to an Adverse Inference.

The circumstances surrounding Plaintiffs' request for an adverse inference have changed subsequent to Defendant's response to this Court's Supplemental Briefing Order.  Specifically, in response to this Court's January 31, 2024 Supplemental Briefing Order, Defendant (i) provided some relevant records not previously produced, and (ii) acknowledged the existence of a current litigation hold on such documents that it previously had denied.  *See* Def. Suppl. Br. at 4–5, 8–9; *see also* Suppl. Br. Order; Def. Reply at 24 (stating there was no litigation hold); Oral Arg. Tr. at 52:24–53:2, 53:5–7 (stating records were destroyed in the normal course in response to the Court's question regarding whether a duty to maintain records existed).  Nevertheless, the record does not support that the Agency acted with a culpable state of mind sufficient to meet the requirements for the imposition of an adverse inference.

In their Response to Defendant's Motion for Summary Judgment, Plaintiffs contended they lacked access to the full complement of records necessary to properly identify instances of improper payment, and accordingly requested an adverse inference based on alleged spoliation of evidence.  Pl. Resp. at 31 (citing *Lab. Corp. of Am. v. United States*, 108 Fed. Cl. 549, 557 (2012)). Plaintiffs claimed Defendant failed to maintain red-pen schedules, which Plaintiffs alleged should

have been subject to a litigation hold due to the *Horvath* litigation.  *Id.* at 32.  Specifically, Plaintiffs claimed that Defendant did not produce red-pen schedules for nineteen dates[22] identified by Naltner and did not produce any red-pen schedules reflecting Deetz's protection activities.  Pl. Resp. at 32–33; Naltner Timesheet (Naltner's identification of the days of missing red-pen schedules).

In its original Reply in Support of its Motion for Summary Judgment, Defendant asserted that an adverse inference is unwarranted because Plaintiffs could not demonstrate that Defendant acted in bad faith.  Def. Reply at 23 (citing *Columbia First Bank, FSB v. United States*, 58 Fed. Cl. 54, 56 (2003)).  Defendant further contended there was no evidence that red-pen schedules exist for each claimed instance because (i) not every week has a red-pen schedule, and (ii) any records that did exist were maintained for three years and disposed of in the normal course.  *Id.* at 24; Scott Depo. at 65:12–16.  Finally, Defendant countered that red-pen schedules were not subject to a litigation hold following the July 20, 2018 *Horvath I* decision invalidating consecutive hours regulation.  Def. Reply at 24.  Accordingly, it argued any failure to maintain schedules two-and-a-half years after it changed that pay policy post-*Horvath*, on September 12, 2018, did not constitute bad faith.  *Id.*; *see* Scott Decl. ¶ 10.

Subsequently, this Court entered its Supplemental Order seeking, *inter alia*, (i) an explanation of the Agency's search for schedules and relevant emails, (ii) an explanation of whether relevant documents were subject to a litigation hold pursuant to *Horvath*, and (iii) if Defendant determined a further search was necessary, details of that search as well as any relevant documents found.  Suppl. Br. Order at 11–12.  In response to the Supplemental Order, Defendant

---

[22] Plaintiffs initially alleged that red-pen schedules were not produced for nineteen dates. However, Defendant points out that Naltner is incorrect and that red-pen schedules were not initially produced for nine of the cited dates, not nineteen.  *See* Def. Suppl. Br. at 9.

undertook an additional search in 2024. Def. Suppl. Br. at 8. This Court learned three relevant facts from Defendant's 2024 search. *First*, this Court now knows that Defendant did not initially produce all of Naltner's red-pen schedules to Plaintiffs. *See* Def. Suppl. Br. at 9. This contradicts Defendant's previous statement made in response to Plaintiff's request for an adverse inference. Def. Reply at 24 ("[T]here is no evidence that red pen schedules existed for every date that plaintiffs claim . . . ."). However, as Defendant notes, and Plaintiffs do not dispute, Defendant has now produced all the red-pen schedules that Naltner initially claimed were not produced. *See* Def. Suppl. Br. at 8–9; *see generally* Pl. Suppl. Resp. And none of these newly produced red-pen schedules reflected any changes from Naltner's original schedules for those dates, which again Plaintiffs do not dispute. *See* Def. Suppl. Br. at 9; Brittan Decl. ¶ 24; *see generally* Pl. Suppl. Resp.

*Second*, this Court now knows that a litigation hold was in fact issued on June 10, 2016 regarding:

> [S]pecial agent protection schedules created in advance of the administrative workweek, red pen protection schedules, special agent time and attendance records, policies and internal operating procedures, calendars, emails regarding special agent schedules (both draft or final), and communications regarding special agent protective schedules.

Def. Suppl. Br. at 4–5. That litigation hold was in place when the present action commenced and has not since been lifted. *Id.* at 5. This fact also contradicts several statements made by Defendant throughout this action. *See* Def. Reply at 24 ("That means that no litigation hold was in effect until [March 2021] at the earliest (2.5 years after the agency changed its pay policy)."); Oral Arg. Tr. at 52:24–53:2, 53:5–8 (The Court: "[W]as there a duty for the agency to keep these schedules? Do you know if there was some sort of duty to keep these or if it was division by division or there was no duty?" Defendant Counsel: "I think that the records were maintained in the ordinary course and destroyed in the ordinary course.").

24

*Third*, despite the existence of the litigation hold, some records regarding Deetz's schedules may have been disposed of by the Secret Service. *See* Def. Suppl. Br. at 10. While Deetz worked in investigative divisions during the relevant time period—not in a protective division—he was sometimes scheduled to perform protective work. *Id.* at 6. Indeed, Deetz occasionally worked as a post-stander for protective assignments for in-town movements for the Presidential Protection Division (PPD). *Id.* at 7. Defendant has explained that the PPD does not generally create work schedules for non-PPD special agents who provide post-stander support in such situations. *Id.* Further, Defendant represents that the Washington Field Office (WFO), the other location where Deetz' schedules may have been kept, also does "not generally create a work schedule or red pen schedule for presidential visits in the Washington D.C. area." *Id.* Defendant claims that its updated, 2024 search did not reveal any new original or red-pen schedules for Deetz, which "comported with [the Office of Protective Operations' (OPO)] and WFO's explanation that schedules were typically not created for post-standers for in-town protective assignments involving movements for the President." *Id.* at 8. However, in its 2024 search Defendant discovered two new emails that reflect hours that Mr. Deetz had worked on protective assignments for two relevant days. *Id.* While Defendant states that Agency's Office of Chief Counsel "never directed or gave permission for anyone in the Secret Service to remove Mr. Deetz's schedules from the litigation hold" nor "g[a]ve permission for anyone in the agency to dispose of any original or red pen schedules for Mr. Deetz," Defendant is unable to confirm that both offices maintained all of Deetz's original and red-pen schedules, as well as emails reflecting his schedule, despite the litigation hold. *Id.* at 10.

Spoliation is "the destruction or material alteration of evidence or [] the failure to preserve

property" when a party has a duty to preserve such evidence. *Micron Tech., Inc. v. Rambus Inc.*, 645 F.3d 1311, 1320 (Fed. Cir. 2011) (quoting *Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 590 (4th Cir. 2001)). The duty to preserve evidence attaches when "litigation is 'pending or reasonably foreseeable.'" *Id.* (quoting *Silvestri*, 271 F.3d at 590); *see also West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999). In imposing evidentiary and spoliation sanctions, a court must "select the least onerous sanction corresponding to the willfulness of the destructive act and the prejudice suffered by the victim." *Micron Tech.*, 645 F.3d at 1329 (quoting *Schmid v. Milwaukee Elec. Tool Corp.*, 13 F.3d 76, 79 (3d Cir. 1994)). Specifically, "the district court must take into account '(1) the *degree* of fault of the party who altered or destroyed the evidence; (2) the *degree* of prejudice suffered by the opposing party; and (3) *whether there is a lesser sanction* that will avoid substantial unfairness to the opposing party and, where the offending party is seriously at fault, will serve to deter such conduct by others in the future.'" *Id.* (quoting *Schmid*, 13 F.3d at 79) (emphasis in original).

The Federal Circuit has acknowledged that "general rules of evidence law create an adverse inference when evidence has been destroyed and '(1) . . . the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) . . . the records were destroyed with a culpable state of mind; and (3) . . . the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense.'" *Jandreau v. Nicholson*, 492 F.3d 1372, 1375 (Fed. Cir. 2007) (quoting *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir. 2002)). The party seeking to use the allegedly destroyed or missing evidence bears the burden to prove each of these factors. *Id.* (citing *Residential Funding Corp.*, 306 F.3d at 107).

A split exists among courts of appeals regarding whether negligent conduct can give rise

to an adverse inference, or whether an adverse inference is appropriate only to address willful or bad faith conduct. *See, e.g.*, *Jandreau*, 492 F.3d at 1376 n.3 (noting that the Second and Sixth Circuits require only negligent conduct, while the First, Third, Fifth, Tenth, and Eleventh Circuits require willful or bad faith conduct); *Kirkendall v. Dep't of Army*, 573 F.3d 1318, 1326–27 n.6 (Fed. Cir. 2009) (acknowledging the split among the circuits); *Grosdidier v. Broad. Bd. of Governors, Chairman*, 709 F.3d 19, 27–28 (D.C. Cir. 2013) (same).

The Federal Circuit has not expressly endorsed a view on this issue. *See, e.g.*, *Jandreau*, 492 F.3d at 1375–76 (declining to decide whether negligence may support an adverse inference is the correct rule under Federal Circuit law); *Micron Tech.*, 645 F.3d at 1326–27 (suggesting a showing of bad faith is "normally a prerequisite to the imposition of dispositive sanctions for spoliation," such as dismissal, but not opining on the requirements for less severe sanctions). The Federal Circuit has, however, signaled that an adverse inference requires more than negligent conduct. *See, e.g.*, *Jandreau*, 492 F.3d at 1375 (noting that an adverse inference requires a finding that "the records were destroyed with a culpable state of mind"); *Micron Tech.*, 645 F.3d at 1326 (quoting *Gumbs v. Int'l Harvester, Inc.*, 718 F.2d 88, 96 (3d Cir. 1983)) (noting that an adverse inference from destruction of documents is permitted only when the destruction was "intentional, and indicates fraud and a desire to suppress the truth").

After supplemental briefing, the undisputed record demonstrates that Defendant had an obligation to preserve records relevant to this action, and that it potentially disposed of some records that could have been relevant to Plaintiffs' claims. *See Jandreau*, 492 F.3d at 1375; *see also* Def. Suppl. Br. at 4–5, 10; Suppl. Br. Order at 9–10. However, even if this Court were to infer that Defendant destroyed select records despite the litigation hold, in order to grant an adverse inference against Defendant this Court would still need to find that the Secret Service

inappropriately disposed of records with a culpable state of mind—*i.e.*, more than negligently—given the Federal Circuit's reasoning in *Jandreau* and *Microntech*. *See Jandreau*, 492 F.3d at 1375; *Micron Tech.*, 645 F.3d at 1326.

Here, there is no evidence that Defendant disposed of records with a culpable state of mind. Instead, Plaintiffs' argument for an adverse inference primarily rests on two assertions: (1) there was, or should have been, a litigation hold on requested records that were in Defendant's possession; and (2) schedules and emails were either destroyed or not produced. *See* Pl. Resp. at 32–33; Pl. Suppl. Resp. at 7–9. As noted further below, taken as true, these bare facts are, on their own, insufficient to demonstrate a culpable state of mind here, and Plaintiff makes no further attempt to demonstrate a culpable state of mind. *See* Pl. Resp. at 32–33; Pl. Suppl. Resp. at 7–9.

In examining alleged bad faith in document destruction matters, the Federal Circuit presumes that government officials "have discharged their duties in good faith—a presumption that can be overcome only by clear and convincing evidence to the contrary." *Rd. & Highway Builders, LLC v. United States*, 702 F.3d 1365, 1369 (Fed. Cir. 2012); *see also Am–Pro Protective Agency, Inc. v. United States*, 281 F.3d 1234, 1240 (Fed. Cir. 2002) ("Showing a government official acted in bad faith is intended to be very difficult."). Other judges of the Court of Federal Claims have applied this presumption of good faith, including in rejecting a plaintiff's claim regarding the existence of unproduced evidence. *See Confidential Informant 59–05071 v. United States*, No. 11–153C, 2016 WL 3960442, at *3 (Fed. Cl. June 21, 2016) ("Because Plaintiff bears the burden of proof on these matters, and in light of the presumption of good faith on the part of government officials, the Court cannot conclude—based on the record before it—that spoliation has occurred."); *Hardwick Bros. Co., II v. United States*, 36 Fed. Cl. 347, 418 (1996) (quoting *Sanders v. U.S. Postal Serv.*, 801 F.2d 1328, 1331 (Fed. Cir. 1986)) ("Many Claims Court cases

have held that 'irrefragable proof' of governmental wrongdoing is required to overcome this presumption.  The court is convinced that the level of proof was not reached by plaintiff in this case.").

Additionally, though not binding, the Court notes that other judges of this court have also recognized that damage or destruction of documents in and of itself is insufficient to demonstrate a culpable state of mind.  *See Reaves v. United States*, No. 16–141 C, 2023 WL 5926818, at *4–5 (Fed. Cl. Sept. 12, 2023).   In *Reaves*, Plaintiff cited a destroyed file cover and the alleged destruction of unproduced records in support of its request for an adverse inference.  *Id.* at *4.  The court found this insufficient to present a "plausible, concrete suggestion[] as to what [the destroyed] evidence might have been."  *Id.* (quoting *Micron Tech., Inc.*, 645 F.3d at 1328) (finding that plaintiff failed to demonstrate a culpable state of mind simply by arguing that the file cover was found, and defendant did not have the authority to destroy the associated records).

More permissively, other judges of this court have found spoliation where a party was "blameworthy" for the actions of an individual who discarded relevant documents.  *See K–Con Bldg. Sys., Inc. v. United States*, 106 Fed. Cl. 652, 664–65 (2012) (citing *Foltice v. Guardsman Prods., Inc.*, 98 F.3d 933, 940 (6th Cir. 1996)) ("To be culpable merely means to be blameworthy or responsible for the conduct at issue.").  In *K-Con*, however, the court found that the parties' conduct rose above mere negligence given the actions leading to the destruction of evidence.  *See id.* at 667 ("It strains credulity to attribute the government's actions to mere negligence."); *id.* at 668 ("At a minimum, [the individual's] disposal of the documents constitutes grossly negligent conduct.").  The facts of *K-Con* illustrate, in this Court's view, the level of culpability required under Federal Circuit precedent.  In *K-Con*, an individual discovered and took home relevant evidence after such evidence had been accepted and stored under another employee's desk for

29

years without review. *Id.* at 657, 667. Then, in the middle of trial, on the day in which the individual was to testify, he delivered a CD with a small percentage of the previously missing, relevant documents. *Id.* at 655, 667. And then, just two days later, after being informed that he may be recalled to testify, the witness destroyed 75% of the relevant materials in his possession. *Id.* at 656, 667–68. This behavior reflects substantially more evidence of bad faith than is evident in the present case.

Indeed, though the present record may support a finding that the Agency mismanaged the maintenance and production of agent time and work schedules, this alone is insufficient to sustain the imposition of an adverse inference. *See* Def. Suppl. Br. at 3–4 (acknowledging significant vulnerabilities in its record-keeping due to the decentralized nature of creation and maintenance); *id.* at 10 (acknowledging that schedules, which would seem to have been covered by the litigation hold, may have been disposed of, even if affirmative permission was not given to do so). Indeed, as explained above, Federal Circuit jurisprudence requires that this Court recognize a presumption of good faith on the part of the Government, and Plaintiffs have not sufficiently rebutted that presumption; at most here, the evidence reflects mismanagement and miscommunication among several components of the Agency. *See Rd. & Highway Builders*, 702 F.3d at 1369. In the face of the Federal Circuit's reasoning in *Jandreau* and *Micron Technologies*, more than mismanagement is necessary for the imposition of an adverse inference here. That some records may have been discarded in the face of a duty to preserve is alone insufficient, without a demonstration of "clear and convincing evidence" that the Agency intended to destroy records during litigation. *See id.* There is simply no evidence in the record, much less clear and convincing evidence, of any malintent by Defendant to destroy records related to this case or any other bad faith action by Defendant. Indeed, Defendant intensified its search for records after this Court's

January 31, 2024 Order and produced all the red-pen schedules for Naltner that Plaintiff had requested following its 2024 search, further evidencing that Defendant was not actively disposing of or hiding relevant records.  Instead, as noted, the record reflects mismanagement and a lack of communication among different divisions of the USSS and with the Department of Justice.  Brittan Decl. ¶ 2.  Plaintiffs have therefore failed to demonstrate that Defendant has acted in bad faith in withholding or destroying relevant documents.  Accordingly, pursuant to Federal Circuit jurisprudence, Plaintiffs are not entitled to an adverse inference in litigating this summary judgment motion.

## II.    The Record Demonstrates Genuine Issues of Material Fact.

Even without an adverse inference, the record reveals genuine issues of material fact, and this Court must deny summary judgment in part.  Plaintiffs claim that a review of Defendant's Supplemental Brief enabled them to confirm they were not properly compensated for some overtime worked.  Pl. Suppl. Resp. at 10 (citing *id.*, Deetz Suppl. Decl.); *id.*, Ex. G, Declaration of Richard Naltner (ECF No. 52-7) (Naltner Suppl. Decl.)).  Defendant maintains its position that the record does not demonstrate any instance of underpayment for either Plaintiff.  *See* Def. Suppl. Br. at 9–10; Def. Reply at 9–15; Mot. at 29–32; *see also* Def. Suppl. Reply at 2–4 (addressing three instances Naltner claimed in Plaintiffs' Supplemental Response).

Defendant bases its contention partially on its assertion that the Complaint only encompasses claims for instances of split-LEAP that would be affected by the now-invalidated regulation.  Def. Reply at 8–9 & n.1 (claiming Plaintiff never articulated any theory for further compensation other than that created by instances of split-LEAP); *id.* at 8 (citing Compl. ¶¶ 1, 42) ("[T]he only hint of some other, undefined overtime claim stems from plaintiffs' boilerplate language that they are seeking back pay for performing protective services 'including, but not

limited to' working two hours of overtime not scheduled in advance of the administrative workweek."). In its supplemental briefing, Defendant maintains that its prior split-LEAP analysis remained unchanged, and that Naltner could not demonstrate a date on which he recorded a split-LEAP. *See* Def. Suppl. Br. at 9–10 ("Those schedules reveal that he never recorded any 1-1 split LEAP. . . ."); Def. Suppl. Reply at 1 ("In our motion for summary judgment and reply in support thereof, we proved . . . why the plaintiffs are not entitled to overtime pursuant to 5 U.S.C. § 5542(e) for working split-LEAP hours.").

Plaintiffs contend their claims are not limited to instances of split-LEAP. *See* Compl. ¶ 1 ("[W]ages that the USSS should have paid to [Plaintiffs] . . . while performing certain duties, including protective services authorized by Section 3056(a) of Title 18, and including, but not limited to, performing at least two hours of overtime work not scheduled in advance of the administrative workweek."); *id.* ¶ 7 (alleging their case "primarily, but not exclusively, involves payment of wages for hours spent on protective details"); *id.* ¶ 22 (suggesting improper payment due to the invalidated OPM regulation is just "[o]ne improper pay practice" that resulted in underpayment for overtime); *id.* ¶ 33.b. ("Whether Special Agents have otherwise been paid correctly for the time that they have worked."); Pl. Resp. at 18 (asserting their claims are "broader as discussed further, *infra*").

In denying summary judgment in *Horvath II*, the court noted that plaintiff's claims did not need to implicate the invalidated OPM regulations specifically, but rather plaintiff could withstand summary judgment by more generally demonstrating that he was entitled "to more § 5542(e) pay than he originally received under the [Agency's] pay policies." *Horvath II*, 2020 WL 1487642, at *3, *4. There, plaintiff was able to show this entitlement by pointing to days on which he would have been due Section 5542(e) pay but had been instructed to report two fewer hours of overtime

than he in fact worked. *Id.* Here, Plaintiffs have made similar claims. *See* Pl. Resp. at 22 ("[Agents] were instructed to report working 8 hours, 2 hours, and 2 hours because the agent would only be compensated with LEAP pay regardless."); *id.* at 23 ("The Government enforced its '8-2-2' policy and discouraged Special Agents from reporting hours that did not fit within the policy."); *id.* at 27 (citing Emails). As in *Horvath II*, the record here indicates that there may be instances of improper pay to Plaintiffs beyond split-LEAP scenarios. Indeed, as noted below, the record demonstrates possibilities of improper compensation for overtime hours worked that were compensable under Section 5542(e) but were not split-LEAP instances. The question of whether Plaintiffs should be further compensated for such hours worked largely turns on discrepancies in the factual record and on witness credibility. Accordingly, as explained further below, summary judgment is inappropriate.

### A.    Naltner

In response to Defendant's Supplemental Brief and newly disclosed schedule records, Naltner identifies 14 dates on which he claims Defendant paid him less overtime than he had earned. *See* Naltner Suppl. Decl. at 3. In contrast, Defendant asserts that "[f]or every single one of the dates listed . . . , [Naltner] was paid exactly what he was entitled to." Def. Suppl. Reply at 2. Defendant provides its own analysis of the first three identified dates to assert that Section 5542(d) remained in effect because Plaintiff did not work unscheduled overtime, and consequently that Naltner was not entitled to additional overtime under Section 5542(e). *See id.* at 2–4. After a full review of the record, however, the Court notes that two of Defendant's explanations of the hours and pay are inconsistent with its own records. Further, Naltner's records demonstrate possible improper compensation for several of the other dates listed.

In the first example, Naltner claims he was improperly paid LEAP instead of standard overtime for two hours on March 22, 2016. Naltner Suppl. Decl. at 3. In response, Defendant states:

> Mr. Naltner's original schedule (attached hereto at Exhibit 2 at GOV00000912) shows that he was scheduled to work from 8am-6:30pm. His red pen schedule shows that his schedule was unchanged, and thus he actually worked from 8am-6:30pm. *See* ECF No. 52-7 at ECF page 23 (GOV00001792). His WebTA shows that he was paid for 8 hours of regular time (8am-4pm), 2 hours of LEAP (4pm-6pm), and 30 minutes of scheduled overtime with night differential (6pm-6:30pm). *See* (ECF No. 52-7 at ECF page 6). Under 5 U.S.C. § 5542, the first two hours of *scheduled* overtime (4pm-6pm for this date) are paid via LEAP. *See* ECF No. 40 at 5-6. Scheduled hours in excess of ten (from 6-6:30pm for this date) are paid out at overtime. *Id.* Therefore, Mr. Naltner was, in fact, paid all the overtime to which he was entitled under § 5542 because he did not work any unscheduled hours of overtime on this date.

Def. Suppl. Reply at 2–3 (emphasis in original). Defendant's explanation would be correct if the hours recounted matched the hours in the records. If Naltner had worked 10.5 scheduled hours, he should have received base pay for the first eight hours, LEAP for hours nine and ten, and standard overtime for the remaining half-hour. This is because Naltner would have only been entitled to standard overtime pay for the half-hour in excess of 10 hours under Section 5542(d), and he would not have been entitled to any standard overtime under Section 5542(e) because he did not work "at least 2 hours of [unscheduled] overtime." 5 U.S.C. §§ 5542(d), (e).

However, Naltner's WebTA records, cited by Defendant in its explanation, demonstrate that the Agency approved and paid him for 12.5 hours. *See* Naltner Suppl. Decl. at 6 (attaching GOV000173). As opposed to the two hours for which Defendant claims Naltner was properly paid LEAP, the record reflects four hours compensated by LEAP. *Id.* The MARS records Defendant provided further demonstrate that Naltner recorded two LEAP hours for a vice presidential "protective detail assignment" that day. Scott Decl. at 49 (attaching GOV000034). If Defendant acknowledges (i) that Naltner was scheduled for 10.5 hours, (ii) that Naltner worked

protective duty, and (iii) that Defendant approved that Naltner worked 12.5 hours, such an instance may implicate Section 5542(e). Naltner arguably worked 2.5 hours of scheduled overtime hours on protective duty, as well as two hours of *unscheduled* overtime. *See* Naltner Suppl. Decl. at 23 (citing GOV - 001792) (showing Naltner was only scheduled to work 10.5 hours).

Therefore, the record evidence appears to show that Naltner should have been paid standard overtime for 2.5 hours of scheduled overtime but was only paid for .5 hours and Defendant has not provided a reason as to why Naltner was only paid for .5 hours. *See* 5 U.S.C. § 5542(e). Defendant may argue that hours were improperly recorded or paid, but at this stage in the proceedings, discrepancies in the record regarding scheduled hours, recorded and paid hours, taken together with Defendant's lack of explanation, demonstrate a triable issue of fact.

As another example, Naltner claims he was similarly denied two hours of standard overtime on August 7, 2016. Naltner Suppl. Decl. at 3. Defendant states:

> Mr. Naltner's original schedule shows that he was scheduled work [sic] from 8am-7:15pm. *See* Ex. 2 hereto [sic] at GOV00000937. His red pen schedule shows that his schedule was unchanged and that he in fact worked from 8am-7:15pm. *See* ECF No. 52-7 at ECF page 25 (GOV00001796). His WebTA shows that he was paid for 8 hours of Sunday pay (8am-4pm), 2 hours of LEAP (4-pm-6pm), and 1 hour and 15 minutes of scheduled overtime with night differential (6pm-7:15pm). *See* ECF No. 52-7 at ECF page 10. Mr. Naltner was, again, in fact, paid all the overtime to which he was entitled under § 5542 because he did not work any unscheduled hours of overtime on this date.

Def. Suppl. Reply at 3. Defendant's explanation is correct based on 11.25 *scheduled* hours—*i.e.*, base pay for the first eight hours, LEAP for hours nine and ten, and standard overtime for the remaining 1.25 hours (hours in excess of 10, pursuant to Section 5542(d)). Again, however, the record demonstrates a different number of hours than described.

Indeed, Naltner's WebTA records, cited by Defendant in its explanation, demonstrate that the Agency approved and paid him for 13.25 hours. *See* Naltner Suppl. Decl. at 10. Whereas Defendant claims Naltner was properly paid LEAP for two hours, the record displays four hours

35

paid pursuant to LEAP.  *Id.*  Defendant's MARS records similarly demonstrate that Naltner recorded two LEAP hours for a vice presidential "protective detail assignment" that day.  Scott Decl. at 63.  Naltner arguably worked 3.25 hours of *scheduled* overtime on protective duty, as well as two hours of *unscheduled* overtime, possibly implicating Section 5542(e).  *See* Naltner Suppl. Decl. at 25 (citing GOV - 001796) (showing Naltner was only scheduled to work 11.25 hours). Again, any alleged discrepancy in hours worked and whether the hours listed in WebTA demonstrate adequate unscheduled overtime hours is a matter to be resolved at trial.

While even one example is sufficient to support a triable issue of fact, the Court further notes that seven other provided instances demonstrate at least two possible *unscheduled* overtime hours worked in conjunction with scheduled overtime occurred, where Naltner's MARS report confirms he worked protective duty.[23]  *See, e.g.*, Naltner Suppl. Decl. at 3 (August 11, 2016); *id.* at 25 (showing Naltner was scheduled to work 11 hours); *id.* at 10 (showing Naltner was approved and paid for 13 hours, and that he was paid LEAP for four hours and standard overtime for one hour); Scott Decl. at 63 (showing Naltner recorded two LEAP hours on a vice presidential protective detail).  Drawing all justifiable inferences in favor of the Plaintiff, as the non-movant, Naltner has demonstrated specific facts to create a genuine issue of material fact regarding whether he was properly compensated under Section 5542.  *See Almanza*, 935 F.3d at 1336–37; *Shum*, 633 F.3d at 1076.

### B.    Deetz

Defendant asserts that upon its 2024 search, it found "two dates for which Mr. Deetz was scheduled for a protective assignment, had recorded 1-1 split LEAP in MARS, and for which OPO

---

[23] The dates include August 11, 2016, December 31, 2016, January 3, 2017, January 7, 2017, January 17, 2017, January 19, 2017, and October 6, 2017.

did not have a schedule: September 19, 2015 and November 11, 2016." Def. Suppl. Br. at 6–7.[24] Defendant provided two emails reflecting Deetz's hours worked for those days. *Id.* at 8 (citing Brittan Decl., Attach. C at GOV001812–25). Defendant found no further red-pen schedules or emails. *See id.*. Plaintiff argues that there would have been emails any time Deetz worked for another office to note his scheduled and unscheduled overtime. *See* Pl. Suppl. Resp. at 8–9.

Plaintiffs claim that "Deetz routinely worked LEAP before and after scheduled hours for over 20 years," but that Defendant relies on a few select dates from its search to claim he has no further compensable overtime. Pl. Resp. at 28. In addition to refuting the five specific dates it found, Defendant claims Deetz was ineligible for further pay because he had reached applicable pay caps in 2015 and 2016. *See* Mot. at 25–28. Significantly, Plaintiffs do not contest that Deetz's pay was capped for those two years. *See* Oral Arg. Tr. at 78:24–79:1 (The Court: "But you would agree he hit the caps in 2015 and '16." Plaintiff's Counsel: "I agree."). It is also uncontested, however, that Deetz did not reach the statutory pay cap in 2017 and 2018. *See id.* at 15:13–14 (Defendant's Counsel: "So he did not reach the statutory cap in the subsequent years.").

While Defendant asserts that the Court should grant summary judgment due to a lack of documentary evidence in support of Deetz's claims, Deetz has presented declarations and emails that have raised material credibility issues and genuine issues of material fact. A triable issue of fact remains for Deetz's 2017 and 2018 pay based on Deetz's testimony and circumstantial evidence in the record that Plaintiffs were instructed or persuaded to input their hours in a manner that did not capture their full overtime entitlement—*i.e.*, that they worked sufficient unscheduled overtime, though non-consecutively, to earn standard overtime pay under Section 5542(e) but were

---

[24] Both of these dates were discovered by Defendant in its original search, and Defendant assessed that Deetz had been correctly paid for all scheduled overtime. *See* Mot. at 23–25.

not paid for it.  *See, e.g.*, Emails at 2 (assuming "any 12 hour shift is 8-2-2" without an email justification for "2 consecutive hours of leap"); *id.* at 7 (providing two examples of application of the 8-2-2 rule, including the requirement for "2 consecutive hours of LEAP"); *id.* at 16 (instructing agents to send an email with justification to get Section 5542(e) pay but telling the agents that no action is necessary if they did not work at least *two* hours prior to their shift); *see also* Deetz Decl. ¶¶ 3–4 ("Between 2015 and 2018, I spent considerable time working on protective details.  During that time, I performed two hours of non-consecutive, unscheduled overtime work not scheduled in advance of the administrative workweek, which was attributed to LEAP rather than to overtime compensation."); Pl. Resp. at 27 (citing Emails) (alleging instructions from superiors regarding the ability to claim standard overtime); Compl. ¶ 20 ("[Deetz] worked the following days without overtime compensation as a result of the improper pay practices referenced above: 2016: 35 days and 2017: 14 days.").

Although Defendant concludes that no schedules or emails exist that demonstrate Deetz is due additional overtime pay, the Court notes such records may be unavailable due to the environment surrounding the reporting of non-consecutive unscheduled overtime or due to the Agency's imperfect record-keeping procedures.  *See* Def. Suppl. Br. at 6–8 (describing requests to multiple different offices, which do not create the work schedules); Brittan Decl. ¶ 2; *supra* Discussion Section I; *see also* Emails at 2, 7, 16.  This indicates that witness testimony will be necessary to elaborate on whether Deetz actually worked the hours he claims and that the Court will need to assess the credibility of such witnesses.

Plaintiffs' claims for certain overtime present genuine issues of material fact because: (1) Plaintiffs' asserted overtime includes years in which Deetz did not reach his pay cap; (2) there is a general lack of clarity as to who creates and maintains schedules; and (3) email records

demonstrate instructions potentially causing special agents to record their time in a manner that precluded qualification for standard overtime because of non-consecutive unscheduled overtime hours worked. Therefore, resolution of Deetz's claims will necessarily turn on testimony from witnesses at trial and this Court's credibility determinations. Thus, summary judgment is not the appropriate vehicle to dispose of a claim where, as here, the determination will largely turn on a determination of witness credibility. *See TypeRight Keyboard Corp. v. Microsoft Corp.*, 374 F.3d 1151, 1158 (Fed. Cir. 2004) ("[S]ummary judgment is not appropriate where the opposing party offers specific facts that call into question the credibility of the movant[']s witnesses."); *see also AT&T Advert., L.P. v. United States*, 147 Fed. Cl. 478, 484 (2020). Drawing all justifiable inferences in favor of the non-movant Plaintiff, Deetz has sufficiently demonstrated a genuine issue of material fact exists regarding whether he was properly compensated in 2017 and 2018 under Section 5542. *See Almanza*, 935 F.3d at 1336–37; *Shum*, 633 F.3d at 1076.

## III.  Claims Accruing Before March 15, 2015 are Barred by the Statute of Limitations.

Defendant argues that Plaintiffs' claims that accrued prior to March 15, 2015 are barred by the statute of limitations. Mot. at 32–33. Plaintiffs contend that they are not barred from bringing such claims because the statute of limitations was tolled during the pendency of the *Horvath* case.[25] Pl. Resp. at 30–31. Defendant is correct.

---

[25] It is unclear if Plaintiffs are attempting to argue that both Naltner and Deetz are entitled to compensation prior to 2015. In their Complaint, Plaintiffs allege that Naltner worked hours in 2014 for which he seeks compensation. Compl. ¶ 19. Plaintiffs do not make a similar allegation for Deetz, but state that the hours for which he seeks compensation "may change based upon further investigation." *Id.* at ¶ 20. In their summary judgment briefing, Plaintiffs did not cite any dates prior to 2015 for Deetz and, in his declaration, Deetz only alleges protective detail work from 2015 to 2018. *See* Deetz Decl. ¶ 3; *see generally* Pl. Resp.; Pl. Suppl. Resp. Despite this, for the sake of clarity the Court notes that its statute of limitation holding applies to both Naltner and Deetz.

The Tucker Act's statute of limitations limits the jurisdiction of the Court of Federal Claims to claims filed within six years of the date the claims first accrue. 28 U.S.C. § 2501 ("Every claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues."). This statute of limitations is jurisdictional. *John R. Sand & Gravel Co. v. United States*, 552 U.S. 130, 133–34 (2008).

Here, Plaintiffs seek pay under Title 5—specifically 5 USC §§ 5542(e) and 5596. *See* Compl. ¶ 5, 21–22, 45. It is well-established that claims brought in the Court of Federal Claims pursuant to Title 5 are subject to Section 2501. *See Acton v. United States*, 932 F.2d 1464, 1465 (Fed. Cir. 1991) ("The statute of limitations for [] Tucker Act claims under Title 5 is six years.") (citing 28 U.S.C. § 2501). Accordingly, absent tolling, the statute of limitations bars any of Plaintiffs' claims that had not accrued before March 15, 2015, six years before the filing of their Complaint.[26]

Plaintiffs briefly state, without reference to any case, that the Section 2501 limitations period was tolled while the *Horvath* putative class action was pending. *See* Pl. Resp. at 30–31.

---

[26] In pay cases, such as this one, claims first accrue when the compensation at issue should have been received by the employee, *i.e.*, the employee's payday for the relevant period. *See Bowman v. United States*, 7 Cl. Ct. 302, 303 n.1 (1985) (noting that certain claims for overtime pay by plaintiffs under 5 U.S.C. § 5544 were foreclosed because "[i]n pay cases, a cause of action first accrues when the compensation in issue should have been received by the employee") (citing *Bebee v. United States*, 640 F.2d 1283, 1289 (Ct. Cl. 1981)); *Bowden v. United States*, No. 18-1838, 2019 WL 1504378 at *3 (Fed. Cl. Apr. 5, 2019), *aff'd*, 786 F. App'x 255 (Fed. Cir. 2019) (finding that "the statute of limitations starts its run from the most recent non-payment of earned wages" in a case for, *inter alia*, pay under 5 U.S.C. § 5596); *Jones v. United States*, 113 Fed. Cl. 39, 41 (2013) (holding that claims for pay based on 5 U.S.C. §§ 5544 and 5546 accrued "each time payment was due"); *see also Burich v. United States*, 366 F.2d 984, 986–987 (Ct. Cl. 1966) (finding a failure by the Government to make overtime payments after overtime work was performed accrued at that point in time); *Brown Park Ests.-Fairfield Dev. Co. v. United States*, 127 F.3d 1449, 1457 (Fed. Cir. 1997) (endorsing *Burich*, 366 F.2d 984). Thus, Plaintiffs' claims for additional overtime pay for hours worked accrued on the date that they should have been paid for those hours, *i.e.*, their payday.

Though this argument was not further developed in Plaintiffs' briefing, at Oral Argument Plaintiffs

asserted for the first time that under *American Pipe & Const. Co. v. Utah*, 414 U.S. 538 (1974),

"there is tolling of a statute of limitations period during the time that [a] putative class is pending

[] on the exact same issues."[27]   Oral Arg. Tr. at 81:11–15 (citing *Am. Pipe*, 414 U.S. 538).

Accordingly, Plaintiffs contend they should be able to assert claims that first accrued as far back

as June 10, 2010, six years before the complaint in *Horvath* was first filed.  *See* Pl. Resp. at 30.

Even if Plaintiffs had not waived this tardy assertion, *see supra* note *27,* Plaintiffs'

argument would still fail on the merits.  Plaintiffs' argument for tolling is unavailing because the

Tucker Act's statute of limitations is not subject to *American Pipe* class-action tolling.  *Blue Cross*

*& Blue Shield of Kans. City Welfare Benefit Plan v. United States*, --- Fed. Cl. ----, 2024 WL

---

[27] Plaintiffs waived this argument.  *See Elec. Welfare Tr. Fund v. United States*, 166 Fed. Cl. 709 (finding waiver where argument was first presented at oral argument and not briefed); *see also Glob. Equity Mgmt. (SA) Pty. Ltd. v. eBay Inc.*, 798 F. App'x 616, 620 (Fed. Cir. 2020) (citing *SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1320 (Fed. Cir. 2006)) (when a party provides no developed argument on a point, the argument is waived)); *Pandrol USA, LP v. Airboss R'y Prods., Inc.*, 320 F.3d 1354, 1366–67 (Fed. Cir. 2003) (holding an argument is "waived when it [is] not raised in response to the motion for summary judgment").

In their Opposition to Defendant's Motion for Summary Judgment, Plaintiffs contend that the limitations period should be retroactive to the filing of the complaint in *Horvath* because doing so would be an "equitable interpretation of the word *accrues* under Section 2501[.]"  Pl. Resp. at 30. (emphasis in original).  Plaintiffs do not cite to a single source of law to support this argument, nor do they develop the argument beyond two conclusory sentences.  Pl. Resp. at 30–31.

At Oral Argument, counsel for Plaintiffs argued that class-action tolling under *American Pipe* applies to this action.  Oral Arg. Tr. at 80:11–83:4.  Counsel seemingly acknowledged that this *American Pipe* argument was a new argument from what was raised in Plaintiffs' briefing.  When asked by the Court if the *American Pipe* argument was in their briefs, counsel responded "No, I argued for equitable class tolling," suggesting that counsel considers the argument made in their briefs to be distinct from an *American Pipe* argument.  *Id.* at 83:5–14.  Counsel apologized to the Court for not citing to cases in their brief saying that he did "not hav[e] the foresight" to do so.  *Id.* at 83:10–14.

However, as explained further below, even if Plaintiffs had not waived this argument, it would still fail on the merits.

3738315 at *16 (2024); *Kelly v. United States*, 171 Fed. Cl. 550, 560 (2024). Two Supreme Court decisions make this clear. First, in *John R. Sand*, the Supreme Court reiterated long-standing precedent that Section 2501 is jurisdictional and "more absolute" than a typical statute of limitations. 552 U.S. at 133–34; *see Ideker Farms, Inc. v. United States*, 71 F.4th 964, 974–75 (Fed. Cir. 2023) ("Section 2501's six-year limitation is jurisdictional."). Due to its jurisdictional nature, Section 2501 "is impervious to equitable tolling." *Blue Cross*, 2024 WL 3738315 at *17 (citing *John R. Sand*, 552 U.S. at 133–34); *Reoforce, Inc. v. United States*, 853 F.3d 1249, 1264 (Fed. Cir. 2017) (Section 2501 "may not be equitably tolled or waived"). Second, in *California Public Employees' Retirement System v. ANZ Securities, Inc.* (*CalPERS*), the Supreme Court unequivocally held that *American Pipe* class action tolling is equitable—not statutory—in nature. 582 U.S. 497, 509–10 (2016) (holding that *American Pipe* tolling is "grounded in the traditional equitable powers"); *Blue Cross*, 2024 WL 3738315 at *16 (citing *CalPERS*, 582 U.S. at 509–10). As the Supreme Court has ruled both that Section 2501 is impervious to equitable tolling, and that *American Pipe* tolling is equitable in nature, *American Pipe* tolling cannot toll the limitations period of Section 2501.[28] *Blue Cross*, 2024 WL 3738315 at *16, 27 ("*American Pipe* tolling

---

[28] In its 2010 decision, *Bright v. United States*, the Federal Circuit held that *American Pipe* tolling did apply to Section 2501. 603 F.3d 1273, 1274 (Fed. Cir. 2010). However, that decision was issued prior to the Supreme Court's *CalPERS* decision, and rested on the now-invalid thought that *American Pipe* was not an equitable doctrine, but rather a statutory directive. *See id.* at 1287–88. That premise was directly contradicted by the Supreme Court's holding in *CalPERS*. *See CalPERS*, 582 U.S. at 509–10; *Blue Cross*, 2024 WL 3738315 at *17 (holding that *CalPERS* "struck a fatal blow to *Bright's* reasoning at it relates to tolling under section 2501"); *Kelly*, 171 Fed. Cl. at 560 (same). This Court is bound by, and must follow, the intervening Supreme Court precedent in *CalPERS* rather than the contradictory and now-invalid reasoning in *Bright*. *Blue Cross*, 2024 WL 3738315 at *26; *Kelly*, 171 Fed. Cl. at 560; *see also Troy v. Samson Mfg. Corp.*, 758 F.3d 1322, 1326 (Fed. Cir. 2014) (citing *Miller v. Gammie*, 335 F.3d 889, 899 (9th Cir. 2003) (en banc)) (holding that a court may recognize an earlier decision "has been implicitly overruled as inconsistent with intervening Supreme Court authority"); *Ideker Farms*, 71 F.4th at 988 n.11 (stating that the principle in *Troy* remains true even if the Supreme Court does not reference the Federal Circuit precedent at issue).

cannot toll the deadlines in 28 U.S.C. § 2501."); *Kelly*, 171 Fed. Cl. at 560 ("The Tucker Act's statute of limitations is not subject to class-action tolling.").

Accordingly, as *Horvath* cannot toll the six-year statute of limitations of Section 2501, Plaintiffs' claims that accrued before March 15, 2015 are not timely. This Court simply lacks jurisdiction over any such time-barred claims.

## CONCLUSION

For the reasons set forth above, Defendant's Motion for Summary Judgment (ECF No. 40) is **GRANTED in part and DENIED in part**. Accordingly, Plaintiffs' claims accruing prior to March 15, 2015 are dismissed, and Deetz's claims for additional pay in 2015 and 2016 are dismissed.

The Clerk of Court is **DIRECTED** to **LIFT** the stay on Plaintiffs' Class Motion (ECF No. 41). The parties shall **FILE** a Joint Status Report by **November 13, 2024**, which shall include a proposed schedule for (i) amendment, if any, of the Class Motion, (ii) briefing of the Class Motion, and (iii) any other anticipated future proceedings. Any remaining deadlines established by this Court's March 13, 2023 Order (ECF No. 46) concerning the Class Motion are accordingly void.

IT IS SO ORDERED.



*Eleni M. Roumel*
ELENI M. ROUMEL
Judge

October 29, 2024
Washington, D.C.

---

Furthermore, Plaintiffs do not argue that this Court remains bound by *Bright* and indeed fail to reference *Bright* at all. *See generally* Pl. Resp.; Oral Arg. Tr. at 80:11–83:25. In fact, in their response, Plaintiffs call the tolling they seek "equitable." Pl. Resp. at 30 ("This is an equitable interpretation of the word *accrues* under Section 2501[.]") (emphasis in original).